## UNITED STATES DISTRICT COURT
## DISTRICT OF MICHIGAN

| | |
|---|---|
| **D'ETTA FRIDAY,** an individual, and **MARY GRACE JASMIN**, an individual, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**TOTAL LIFE CHANGES, LLC**, a Michigan limited liability company,<br><br>Defendant. | **COMPLAINT**<br><br>**PROPOSED CLASS ACTION**<br><br>**Demand for Jury Trial**<br><br>Case No. 1:21-cv-10231 |

Plaintiffs D'Etta Friday and Mary Grace Jasmin hereby bring this action for damages and other relief against Defendant Total Life Changes, LLC ("TLC"), and hereby allege as follows:

### INTRODUCTION

1.      This consumer class action concerns deceptive and unfair business practices by TLC in the advertisement and sale of its raspberry flavored Iaso® Instant Tea (its "Raspberry Tea"). As set forth below, TLC wrongfully and unfairly deceived the public and its customers by misrepresenting that the Raspberry Tea contained "0.0% THC" (tetrahydrocannabinol, a Schedule One controlled

substance), when in fact the Raspberry Tea contains **at least** 0.875 mg of THC per serving, and may contain more.

2.      TLC advises its customers to drink one serving of the Raspberry Tea per day. Over a thirty-day period, a customer following these instructions has consumed approximately 26.25 mg of THC—more THC than the customer would have consumed by ingesting two marijuana edibles over the same amount of time.

3.      As a result of TLC's deceptive and unfair business practices, customers seeking to purchase lawful hemp-infused products have been tricked into ingesting THC, a federally illegal substance known to have physical and psychoactive effects. They would not have purchased the Raspberry Tea had they known of these effects and are entitled to a refund of the purchase price of this product.

4.      In addition, TLC should be enjoined from advertising this product as THC-free, should recall its product to the extent it contains deceptive and inaccurate labels, and should issue warnings to its consumers and distributors informing them that consumers who have ingested this product are at risk of testing positive for THC in drug tests.

5.      This suit also includes individual claims against TLC by Plaintiffs D'Etta Friday and Mary Grace Jasmin, both of whom lost their jobs after TLC's Raspberry Tea caused them to test positive for THC.

## JURISDICTION & VENUE

6.     This Court has subject matter jurisdiction over the class action claims pursuant to 28 U.S.C. §1332(d) because the matter in controversy exceeds the sum or value of $5,000,000.00 exclusive of interest and costs, and is a class action in which any member of a class of plaintiffs is a citizen of a State different from any defendant.

7.     Specifically, TLC is a Michigan entity whose primary place of business is in Michigan, and both Plaintiffs reside in other states.

8.     TLC's gross revenue for 2019 was roughly $120 million, and the company sells its products using a network of independent distributors, of which there were more than 50,000 operating in the United States in 2019 alone.

9.     Upon information and belief, TLC's total revenues associated with the sale of the Raspberry Tea exceed $5,000,000.00.

10.     As set forth more fully below, Plaintiffs and the putative class members seek recovery of all money they spent purchasing the Raspberry Tea, in addition to injunctive relief. They also seek punitive damages. All told, Plaintiffs and the putative class seek well in excess of the $5,000,000.00 jurisdictional minimum.

11.     This Court also has subject matter jurisdiction over the individual claims under 28 U.S.C. §1332(a), because Plaintiffs reside in different states than

TLC and the amount in controversy for the individual claims exceeds $75,000.

12.     This Court has personal jurisdiction over TLC because TLC's principal place of business is located in Fair Haven, Michigan, and TLC is a Michigan limited liability company.

13.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because TLC resides in this district.

14.     Additionally, by virtue of its terms and conditions, TLC has bound its consumers to litigate any dispute according to the laws of the State of Michigan.

15.     Whenever this Complaint refers to any act or acts of TLC, the reference shall be deemed to mean that the directors, officers, employees, affiliates, or agents of TLC authorized such act while actively engaged in the management, direction, or control of the affairs of TLC.

16.     D'Etta Friday is, and at all times relevant to this action, was, a resident of the State of North Carolina.

17.     Mary Grace Jasmin is, and at all times relevant to this action, was, a resident of the State of Virginia.

## FACTUAL BACKGROUND

### THC and its Effects

18.     Although "hemp" is derived from cannabis, a type of plant in the

4

*Cannabaceae* family, it is treated differently under the law. Under the Agriculture Improvement Act of 2018, Pub. L. 1150334 (the "2018 Farm Bill"), hemp-derived products containing less than 0.3% THC on a dry weight basis are no longer considered controlled substances under federal law.

19.     Conversely, products containing higher levels of THC remain illegal federally, despite the fact that several states have legalized cannabis for medicinal purposes (and a handful have legalized it for recreational use).

20.     Despite its illegality, cannabis (and, specifically, its primary psychoactive compound, THC) remains the second most commonly used psychotropic drug in the United States, according to the National Institute on Drug Abuse: https://www.drugabuse.gov/publications/drugfacts/marijuana.

21.     On a short-term basis, THC over-activates specific parts of the brain to induce effects of a "high." These effects include altered perception, impaired body movement, difficulty thinking, impaired memory, hallucinations, and delusions. Consumers with schizophrenia may also experience worsened symptoms.

22.     The long-term effects of THC use are less clear because the substance remains federally illegal. However, there is some evidence the drug may lower IQ, impede the formation of certain connections in the brain, and decrease cognitive function—and these changes may persist even after one stops consuming THC.

23.    Consumption of THC can also increase one's heart rate, may affect child development in pregnant women, and can cause vomiting, nausea, and diarrhea. Exposure to THC can also result in an enhanced addiction response when consumers are later exposed to other addictive substances.

24.    Additionally, between 9% and 30% of those who use cannabis may develop some form of marijuana use disorder.

25.    In short, consumption of THC is linked to a number of harmful effects, and the majority of American consumers make the choice not to ingest THC in any form.

26.    Eleven states (Arizona, Delaware, Georgia, Indiana, Iowa, Michigan, Oklahoma, Rhode Island, South Dakota, Utah, and Wisconsin) have zero-tolerance driving laws for THC in the bloodstream, meaning that the presence of **any** amount of THC in a driver's bloodstream will support a charge for driving while impaired ("DWI" or "DUI"). Six more states (Illinois, Montana, Nevada, Ohio, Pennsylvania, and Washington) have specific *per se* limits beyond which a person is considered to be impaired as a matter of law. These limits range from 1 nanogram to 5 nanograms.

27.    Several other government agencies use drug tests to ensure compliance or to confirm eligibility for certain programs. Drug testing is ordinarily a condition of release for prisoners on parole, for example, and a requirement for reunification

in parental rights proceedings.

28.     A number of industries and employers require employees to submit to regular drug testing as a condition of employment. For example, in 1991, Congress enacted the Omnibus Transportation Employee Testing Act (the "OTETA"), which requires employers subject to Department of Transportation ("DOT") regulations to conduct drug and alcohol testing. DOT employers are also required to keep records of positive drug test results for five years, and to provide prospective new employers with positive drug test results. Most major DOT employers will not, as a matter of company policy, hire an employee with a failed drug test in their record—especially a recent one.

29.     Even where drug testing is not federally mandated, however, numerous employers utilize it to ensure that employees are not impaired while working. This method is particularly problematic, however, when it comes to testing for impairment related to cannabis.

30.     Because THC is fat-soluble, it can remain in the blood for days after consumption, and urine tests can yield positive THC results for weeks—long after any effects caused by the THC "high" would have passed. By way of contrast, a number of other controlled substances (such as cocaine) are only detectable in urine for a week or less.

31.     As a result, a person who consumes THC is at risk of negative health consequences, receiving a DWI, losing eligibility for certain benefits and/or services, spending time in prison, losing parental rights, getting fired, and/or losing their job or (depending on the industry) license.

32.     TLC's consumers, however, incurred all of these risks unknowingly.

**TLC and its Products**

33.     Founded in 2002, TLC is a multi-level marketing company ("MLM") that primarily sells vitamins and supplements, touted to provide a number of health benefits.

34.     TLC's products are branded through national marketing and advertising campaigns. Product information and brochures are then distributed to a network of independent consultants, which TLC calls "Life Changers," who then sell the product to consumers. To become a Life Changer, an individual must pay $49.95 for a "Business Starter Kit."

35.     Upon information and belief, Life Changers are not required to undergo any training or education prior to selling TLC products.

36.     Life Changers are neither required nor expected to have a background in health sciences or nutrition.

37.     Upon information and belief, TLC makes no effort to audit or review

representations made by the Life Changers who are authorized to sell products on its behalf, nor does it provide training to Life Changers to ensure that statements about its products are accurate.

38.    Life Changers are classified by TLC as independent contractors.

39.    However, in the absence of any prerequisite industry experience or specialization, or sales experience, Life Changers must rely on TLC to provide them with marketing and advertising materials for its products. In fact, they are required to do so.

40.    Per TLC's policy, Life Changers "should only use the sales aids and support materials produced by TLC" because TLC has "carefully designed [its] products, product labels . . . and promotional materials to ensure that the presentation of each aspect of TLC is professional, fair, truthful, substantiated, accurately presented and in compliance with applicable laws or regulations." [Exhibit A at 7.1.]

41.    TLC further reserves the right to edit or discontinue any previously approved materials, giving it the authority to recall any and all advertisements, as needed, to protect consumers.

42.    Life Changers are not permitted to sell products on third-party websites, including Amazon and eBay.

43.    TLC, on the other hand, operates its own Amazon.com store:

https://www.amazon.com/stores/page/109706B5-37CC-4F3F-9DD2-1BB4730837F1.

44.    TLC offers consumers a thirty-day refund for products purchased directly from its website or from one of its Life Changers. Products purchased from third-party marketplaces (including Amazon), however, are not eligible for refund.

45.    One of TLC's flagship products is its Iaso® Detox Tea, about which TLC makes numerous health claims (which it cautions in the fine print are not FDA-approved claims):

> Tea That Takes the Pounds Down
> A world-famous all-natural cleansing drink. Popular benefits of this detox formula include weight loss & weight management, a boost in energy, mental clarity, improved skin, and a gentle cleansing of your intestines and internal organs.* Drink 2 ½ cups a day and lose up to 5lbs in 5 days.*
> The original Iaso® Tea is powered by a unique blend of nine essential herbs designed to cleanse the upper and lower intestines thus ridding the body of harmful toxins.

46.    The ingredients in this product include persimmon leaves, holy thistle, malva leaves, marsh mallow, blessed thistle, papaya, myrrh, chamomile, and ginger.

47.    After achieving success selling its Iaso® Tea, TLC next branched out to offer Iaso® Instant Tea, which allows consumers to "[e]njoy the detox benefits of the original Iaso® Tea in an all-natural instant formula." [Exhibit B.] Unlike the original Iaso® Tea, this product does not need to be brewed; consumers simply empty a packet into 16.9 oz of water.

10

48.    The active ingredients of the Iaso® Instant Tea are: dextrin, cassia angustifolia extract, carica papaya extract, and matricaria chamomilla extract—a significant departure from those contained in the original Iaso® Tea, despite the fact that it purports to offer the same benefits.

49.    In 2020, TLC began offering a third generation of its Iaso® Tea line: CBD-infused tea. This line included two products: a lemon instant tea (the "Lemon Tea") and the Raspberry Tea.

50.    Though both purport to contain hemp-derived CBD, the advertising and labeling for these two products is different in several critical ways.

51.    The Lemon Tea purports to contain "100 mg of agricultural full-spectrum hemp extract grown in Colorado." [Exhibit C.] A disclaimer that appears both in the brochure for this product and on the TLC website contains the following: "Hemp oil extract products utilize a Full Spectrum Hemp Extract, which may contain trace amounts of naturally occurring tetrahydrocannabinol (THC). We are below the Federal Legal Limit and have no more than 0.3% THC by dryweight."

52.    Additionally, on the product page for its Lemon Tea, TLC cautions: "Most drug tests targeting THC will not detect its presence, however, it is recommended that you first verify with your employer or licensing agency for any approval needed prior to using any product containing hemp-based ingredients."

53.     Neither the label nor the advertising for the Lemon Tea, therefore, includes a claim that the product is THC-free. The same cannot be said for the Raspberry Tea.

54.     Unlike the Lemon Tea, the Raspberry Tea purports to contain not **full**-spectrum CBD, but **broad**-spectrum CBD. The packaging containing the Raspberry Tea advertises that it contains: "0.0% THC." [*See* Exhibit D.] Both the graphic on the fact sheet [*Id.*] and other product advertisement graphics [Exhibit E] include a label proclaiming the product as "THC FREE." There are no warnings about THC content either on the fact sheet or on the product page for the Raspberry Tea. Additionally, there is no reference to employer drug testing.



55.    On the contrary, the fact sheet assures consumers: "When the hemp is processed, the entire plant is utilized like full-spectrum hemp, **but the key difference is 100% of the THC is removed, making the product free of any illegal substances**. Our hemp is laboratory tested, certified for quality, and contains 0% THC." [Exhibit D.]

56.    A disclaimer that appears at the bottom of the document further reads, "Total Life Changes, LLC Iaso® Instant Tea utilizes a Broad Spectrum Hemp Extract which contains 0.0% total THC as evidenced through independent laboratory tests."

57.    Any Life Changer who makes representations to consumers, therefore, that the Raspberry Tea contains 0.0% THC, does so consistent with TLC's own representations, labels, and advertising to the same effect.

58.    TLC had notice that the Raspberry Tea contained THC on or before May 22, 2020, when a user named "Brittany" posted a complaint to the Better Business Bureau ("BBB") website, stating, "The raspberry lemonade which clearly states 0.0% THC HAS THC in it! which caused me to fail a DOT Drug test and lose my job! This company is disgusting and when you call to speak with someone No one answers nor calls you back!" [Exhibit F.]

59.    TLC responded to this complaint on May 26, 2020: "Hello Brittany,

We apologize this happened to you. Our Broad-Spectrum Hemp Extract with 0% laboratory certified THC content, over 100 phytonutrients, and over 12.5 mg of CBD per serving. Please review this certificate of analysis for more information: https://totallifechanges.zendesk.com/hc/en-us/articles/360043143074-Iaso-Tea-Instant-with-Broad-Spectrum-Hemp-Extract  Thank you"

60.    The webpage referenced in TLC's response to the BBB complaint has since been taken down.

61.    Despite receiving consumer reports that the Raspberry Tea did, in fact, contain THC, TLC continued to advertise and sell it to unsuspecting customers as being THC-free.

62.    Upon information and belief, TLC did not undertake any additional testing or quality control to ensure that its product was THC-free as a result of these consumer complaints.

63.    As of the date of this filing, although the Raspberry Tea does not appear on the general consumer-facing website, it still appears as a product available for purchase on the TLC-sanctioned Life Changer websites, as well as on third-party platforms such as Amazon and eBay. The Life Changer websites include all of the same claims that the product contains 0.0% THC.

64.    As of the date of this filing, TLC has not issued any recalls of the

Raspberry Tea or made any efforts to inform consumers that the product contains THC, nor has it made any statements to its Life Changers directing them to stop selling the product, or to stop advertising it as THC-free.

65.    Instead, it has quietly removed the fact sheet for the Raspberry Tea from its website and delisted it for sale.

**Plaintiff D'Etta Friday**

66.    D'Etta Friday is a diabetic mother of two, who first purchased the Raspberry Tea to help her achieve her weight loss goals.

67.    In or around June of 2020, Ms. Friday met a Life Changer for TLC, who told her about TLC's Iaso® tea products and their attendant benefits.

68.    At the time, Ms. Friday worked for Commscope in manufacturing support. She knew that as a part of her job she was subject to regular drug screenings. Additionally, she had never consumed an illegal substance in her life. It was extremely important to her to know that the product contained no THC whatsoever. Otherwise, both her job and her moral convictions would be in jeopardy.

69.    TLC's Life Changer assured Ms. Friday that the product was THC-free, explaining that while the Lemon Tea contained trace amounts of THC, the Raspberry Tea did not.

70.    Based on these representations, Ms. Friday ordered the Raspberry Tea

15

from the Life Changer.

71.    When her order arrived, she carefully checked the packaging, labels, and ingredients to confirm that the product did not contain THC before beginning to drink it.

72.    After approximately two weeks of drinking the Raspberry Tea, Ms. Friday injured her hand while at work and initiated a worker's compensation claim with her employer.

73.    As part of Commscope's standard operating procedure, it requires employees to submit to a drug test when making a worker's compensation claim.

74.    Ms. Friday made the arrangements herself. She contacted the testing company and scheduled the appointment. She notified her employer of the date/time and got approval for the test. She drove herself to the testing facility and provided a urine sample for analysis—all completely unaware that she would test positive.

75.    She was subsequently stunned when her employer then contacted her to inform her that she had failed the drug test due to the presence of THC in her urine.

76.    Prior to failing the drug test, Ms. Friday had been an exemplary employee.

77.    During her (roughly) two-and-a-half years with Commscope, she had

never once been issued a verbal or written warning.

78.     On the contrary, she received an award in early 2020 for her teamwork and work ethic.

79.     When Ms. Friday first began working for Commscope she was making $14.00 per hour in the company's shipping and receiving department. At the time of the drug test, she was making $20.00 per hour—a rapid increase that reflects her commitment to the company. She regularly worked overtime, averaging between 50 and 60 hours a week for the duration of her employment.

80.     Yet, as a result of the failed drug test, Ms. Friday was fired from her job in the midst of the global COVID-19 pandemic. She did not receive worker's compensation for her injured hand. She lost her benefits, including health insurance. She did not receive a severance package.

81.     Since that time, she has been unable to secure additional employment. The household (which includes Ms. Friday, her two daughters, and her fiancé) has had to subsist entirely on her fiancé's income and her unemployment benefits, which together total roughly half of what the household was earning before Ms. Friday was fired.

**Plaintiff Mary Grace Jasmin**

82.     Mary Grace Jasmin's story bears tragic similarities to Ms. Friday's.

17

83.     In addition to herself, Ms. Jasmin provides for and supports her 85-year-old father.

84.     On or about August 24, 2020, Ms. Jasmin was approached by a TLC Life Changer, who told her about the potential weight loss benefits associated with the Raspberry Tea.

85.     At the time, Ms. Jasmin worked as a flight attendant for Endeavor Air, a company subject to OTETA drug testing requirements. Ms. Jasmin knew that she would lose her job if she consumed products containing THC. She specifically asked the Life Changer whether the TLC products contained THC.

86.     The Life Changer assured Ms. Jasmin that the Raspberry Tea was THC-free, and provided her with links to TLC's advertising and promotional materials about the product. These confirmed that the product, in fact, contained 0.0% THC.

87.     Relying upon these representations, Ms. Jasmin ordered the Raspberry Tea.

88.     She began consuming the Raspberry Tea daily, as TLC recommends. Roughly one month later, on September 15, 2020, Endeavor Air notified Ms. Jasmin that she was being subjected to a random drug test.

89.     Ms. Jasmin supplied a urine sample as instructed.

90.     She was subsequently shocked when she received a call from Endeavor

Air, notifying her that she had failed the drug test and that testers had found the presence of THC in her urine.

91.    Ms. Jasmin had never consumed illegal drugs in her life.

92.    Ms. Jasmin requested that the sample be retested; it was. Once again, the test showed the presence of THC in her urine.

93.    At this point, Ms. Jasmin reviewed everything she had consumed in the weeks leading up to the test. The only new addition was the Raspberry Tea.

94.    Ms. Jasmin was desperate to prove she had not, in fact, consumed the illegal substance. She stopped drinking the Raspberry Tea altogether. On October 6, 2020, she reported to her family practitioner and provided a urine sample for analysis. Then she prepared and consumed two packets of the Raspberry Tea, waited two hours (all at her doctor's office), and then supplied a second urine sample.

95.    The first sample was negative for THC. The second was positive.

96.    Despite this result, Endeavor Air terminated Ms. Jasmin on October 27, 2020 for failing her drug test of September 15.

97.    Prior to that date, Ms. Jasmin had been an exemplary employee. She had never been issued a verbal or written warning. When she was fired, Ms. Jasmin not only lost her benefits and her income, but she also lost her career.

98.    Because of the DOT's reporting requirements, Endeavor Air is

obligated to report the results of Ms. Jasmin's drug test to any future prospective employers. Ms. Jasmin has been actively seeking employment since the date of her termination, but despite her otherwise immaculate record as a flight attendant, she has not been able to and will likely not be able to find a new job in this industry.

99.     Since her termination, Ms. Jasmin has been depleting her savings to support herself and her father. Soon, however, those funds will be entirely exhausted.

100.    Ms. Friday and Ms. Jasmin would not have purchased TLC's Raspberry Tea had they known that it contained THC.

101.    As a result of TLC's misrepresentations, Plaintiffs and all putative class members who purchased the Raspberry Tea were injured and lost money.

## CLASS ACTION ALLEGATIONS

102.    Plaintiffs bring this class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure and seek certification of the class identified below.

### The Definition of Proposed Class

103.    Plaintiffs bring this class action on behalf of the following national class (the "Class" or "National Class"):

> All persons who purchased the Raspberry Tea from any retail outlet or Life Changer in the United States after January 1, 2020, or who resided in the United States at the time they made online purchases of the Raspberry Tea after January 1, 2020. Excluded from the National Class

are TLC, its officers and directors at all relevant times, members of TLC's immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which TLC has or had a controlling interest.

104.    Plaintiffs reserve the right to amend or modify the National Class definition in connection with a Motion for Class Certification or as the result of discovery.

## The Size of the Proposed Class

105.    Plaintiffs do not currently know the exact size of the proposed Class.

106.    However, Plaintiffs are aware that the members of the National Class are so numerous that joinder of the individual members of the proposed National Class (the "Class Members") is impracticable. On information and belief, the National Class includes tens of thousands of people geographically dispersed throughout the country. The number and identities of Class Members are unknown to Plaintiffs, but can be ascertained through discovery, including into retailers' records of sales, and published notice.

## The Adequacy of Representation by the National Class Representatives

107.    Plaintiffs will fairly and adequately protect the interests of the National Class. Plaintiffs have no interests adverse to the interests of the National Class and have retained counsel with experience in the prosecution of class actions and

complex litigation, including consumer litigation, and who will vigorously prosecute this action.

### The Common Questions of Law and Fact

108.   Questions of law or fact common to the National Class exist as to Plaintiffs and all National Class Members, and these common questions predominate over any questions affecting only individual National Class Members. Among the common questions of law and fact are the following:

a.   Whether there is THC in the Raspberry Tea.

b.   Whether TLC misrepresented that the Raspberry Tea contains no THC.

c.   Whether TLC's representations about the THC content in the Raspberry Tea were false, misleading, or likely to deceive.

d.   Whether TLC misrepresented that the Raspberry Tea has characteristics, uses, or benefits that they do and did not have.

e.   Whether the existence of THC in the Raspberry Tea is a material fact to consumers.

f.   What is the amount of restitution and/or measure of damages to award to Plaintiffs and the National Class.

### The Typicality of Claims of the National Class Representatives

109.   Plaintiffs do not anticipate any difficulties in the management of this

action as a class action. The National Class is ascertainable and there is a well-defined community of interests in the questions of law and fact alleged because the rights of each Class Member were infringed or violated in similar fashion based upon TLC's misconduct. Notice can be provided through records and publication, the cost of which is properly imposed upon TLC.

110.   TLC engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs and the Class Members. Common questions of law and fact predominate over any individual questions that may arise.

111.   The injuries sustained by Plaintiffs and the National Class Members flow, in each instance, from a common nucleus of operative facts—*i.e.*, TLC's misrepresentation of the Raspberry Tea in its product packaging, on its website, and in its fact sheet.

112.   Plaintiffs' claims are typical of the claims of the Classes they seek to represent. TLC's uniform, material misrepresentations and omissions and its use of unfair and deceptive business practices in the marketing and sale of its Raspberry Tea apply equally to Plaintiffs and all Class Members. Moreover, the defenses, if any, that will be asserted against Plaintiffs' claims are typical of the defenses, if any, that will be asserted against the Class Members' claims.

//

<u>The Nature of the Notice to the Proposed Class</u>

113.    Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. The vast majority of the names and contact information for the Class Members is likely available from TLC or its Life Changers. To the extent possible, Plaintiffs contemplate providing notice or notices to the Class, as approved by the Court, to be delivered through the United States Mail or as otherwise directed. In the alternative or in connection with mailed notices, Plaintiffs may utilize paid advertising notices online or in media likely to draw the attention of Class Members, e.g., specialty magazines. The notice or notices shall, among other things, advise the Class that they shall be entitled to "opt out" of the Class if they so request by a date specified within the notice, and that any judgment, whether favorable or not, entered in this case will bind all Class Members except those who affirmatively exclude themselves by timely opting out.

<u>The Additional Matters Pertinent to the Findings as</u>
<u>Provided by Fed. R. Civ. P. 23(b)(3)</u>

114.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy, and individual joinder of all Class Members is impracticable, if not impossible, because the massive number of Class Members are scattered throughout the United States. Moreover, the cost to the court

system of such individualized litigation would be substantial. Individualized litigation would likewise present the potential for inconsistent or contradictory judgments and would result in significant delay and expense to all parties and courts hearing virtually identical lawsuits. By contrast, conducting this action as a class action would present fewer management difficulties, conserve the resources of the parties and the courts, and protect the rights of each Class Member and maximize their recovery.

115.   TLC has acted on grounds generally applicable to the entirety of the Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole.

## FIRST CAUSE OF ACTION
**(Violations of the Michigan Consumer Protection Act, M.C.L. §§445.901 *et seq.*, Asserted by Plaintiffs Individually and on Behalf of the National Class)**

116.   Plaintiffs incorporate by reference all of the above allegations as if fully set forth herein.

117.   At all times relevant to this action, TLC was engaged in trade and/or commerce.

118.   TLC has violated and continues to violate M.C.L. §445.903 in that it has represented and is representing that the Raspberry Tea has certification, approval, performance characteristics, accessories, uses, or benefits it does not have.

119.    Additionally, TLC has violated and continues to violate M.C.L. §445.903 in that it has represented and is representing that the Raspberry Tea is of a particular standard, quality, or grade, when it is of another.

120.    Additionally, TLC has violated and continues to violate M.C.L. §445.903 in that it has failed to reveal a material fact about the Raspberry Tea—the presence of THC—the omission of which tends to mislead or deceive consumers, and which fact could not reasonably be known by consumers.

121.    Additionally, TLC has violated and continues to violate M.C.L. §445.903 in that it has represented and continues to represent a statement of fact material to the transaction (that the Raspberry Tea is THC-free), such that consumers reasonably believe the represented or suggested state of affairs to be other than it actually is.

122.    By claiming that the Raspberry Tea contains 0.0% THC, and/or is THC-free, when the Raspberry Tea contains THC, TLC has violated and continues to violate M.C.L. §§445.901 *et seq*.

123.    In making the representations described herein, TLC knew and should have known that its representations were untrue and misleading, in violation of M.C.L. §§445.901 *et seq*.

124.    TLC's misrepresentations are a material reason Plaintiffs and the

National Class Members purchased the Raspberry Tea.

125.  As a result of TLC's materially false and misleading misrepresentations about the Raspberry Tea, Plaintiffs and the National Class Members have been harmed.

## SECOND CAUSE OF ACTION
**(Breach of Warranty, Asserted by Plaintiffs Individually and on Behalf of the National Class)**

126.  Plaintiffs incorporate by reference all of the above allegations as if fully set forth herein.

127.  TLC promised to consumers, on its product packaging, labels, promotional materials, and information sheets, that the Raspberry Tea had certain characteristics or would meet certain standards; namely, that it contained 0.0% THC.

128.  Additionally, TLC's description of the Raspberry Tea available on all product packaging, labels, promotional materials, and information sheets, represented that it did not contain any THC.

129.  This promise and/or description became part of the basis for the bargain.

130.  The Raspberry Tea did not conform to this promise, in that it contained THC.

131.  As a result of this breach of warranty, Plaintiffs and the National Class

Members ingested harmful illegal substances they would not otherwise have consumed.

132.    Plaintiff and the National Class Members have suffered injury in fact and have lost money and property as a result of TLC's unlawful and unfair practices, in that, among other things, TLC's misrepresentations are a material reason that Plaintiffs and the National Class Members purchased the Raspberry Tea and paid the price that they paid.

133.    Plaintiffs relied on TLC's representations about the THC content in the Raspberry Tea in deciding to purchase the product, and Plaintiffs would not have purchased the Raspberry Tea had they been aware of the actual THC content.

### THIRD CAUSE OF ACTION
### (Strict Products Liability: Failure to Warn; Asserted by Plaintiffs Individually)

134.    Plaintiffs incorporate by reference all of the above allegations as if fully set forth herein.

135.    TLC is both a seller and manufacturer of the Raspberry Tea within the definition of M.C.L. §600.2947.

136.    At all times relevant to this action, TLC knew or should have known that there was a risk of harm associated with the ingestion of THC based on the scientific, technical, or medical information then reasonably available.

28

137.   TLC had, in fact, provided warnings related to the consumption of its product with respect to the Lemon Tea, demonstrating that it was aware of the material risks associated with THC consumption.

138.   Nevertheless, TLC provided Plaintiffs with no warnings of the risks that the product could contain THC, instead specifically asserting the product did **not** contain THC.

139.   TLC additionally provided no warnings of the material risk that consumption of the Raspberry Tea could cause Plaintiffs to fail drug tests.

140.   As a result of this failure to warn, Plaintiffs ingested THC, a controlled substance, and were damaged.

141.   As a further result of this failure to warn, Plaintiffs failed drug tests, costing them their jobs, and possibly their careers.

142.   This has resulted in damages, including lost wages, loss of future earning capacity, emotional distress, medical bills, loss of reputation, and loss of goodwill.

## FOURTH CAUSE OF ACTION
### (Strict Products Liability: Manufacturing Defect; Asserted by Plaintiffs Individually)

143.   Plaintiffs incorporate by reference all of the above allegations as if fully set forth herein.

144.   TLC is both a seller and manufacturer of the Raspberry Tea within the definition of M.C.L. §600.2947.

145.   The Raspberry Tea received by Plaintiffs was defective and/or unreasonably dangerous when it was designed, manufactured, and/or sold by TLC, in that it contained THC.

146.   This was true of the Raspberry Tea at the time it left TLC's control.

147.   It was technically and practically feasible to design and/or manufacture the Raspberry Tea so that it did not contain THC.

148.   Had the Raspberry Tea not contained THC, Plaintiffs would not have been injured.

149.   As a result of the presence of THC in the Raspberry Tea, Plaintiffs were injured.

## FIFTH CAUSE OF ACTION
### (Negligent Failure to Warn; Asserted by Plaintiffs Individually)

150.   Plaintiffs incorporate by reference all of the above allegations as if fully set forth herein.

151.   TLC owed Plaintiffs a duty of care to warn them of material risks associated with consuming THC in the Raspberry Tea.

152.   TLC breached this duty by failing to warn Plaintiffs of those risks, and by misrepresenting that the Raspberry Tea did not contain THC.

30

153.    As a result of this breach, Plaintiffs suffered damages, including medical bills, lost wages, loss of future earning capacity, emotional distress, reputational harm, and loss of goodwill.

154.    It was reasonably foreseeable to TLC that Plaintiffs would suffer such damages as a result of unknowingly consuming a controlled substance.

## SIXTH CAUSE OF ACTION
### (Negligent Manufacture; Asserted by Plaintiffs Individually)

155.    Plaintiffs incorporate by reference all of the above allegations as if fully set forth herein.

156.    TLC is both a seller and manufacturer of the Raspberry Tea.

157.    TLC owed Plaintiffs a duty of care to manufacture the Raspberry Tea in accordance with its 0.0% THC specifications.

158.    TLC failed to act reasonably to manufacture, test, and/or implement quality control measures to ensure that the Raspberry Tea was manufactured correctly.

159.    As a result of TLC's failure to act as a reasonable manufacturer, it produced and sold Raspberry Tea that contained THC.

160.    Plaintiffs suffered damages as a result, including medical bills, loss of wages, loss of future earning capacity, emotional distress, reputational harm, and loss of goodwill.

31

161.   It was reasonably foreseeable to TLC that Plaintiffs would suffer such damages as a result of unknowingly consuming a controlled substance.

## SEVENTH CAUSE OF ACTION
### (Negligent Misrepresentation; Asserted by Plaintiffs Individually)

162.   Plaintiffs incorporate by reference all of the above allegations as if fully set forth herein.

163.   TLC owed Plaintiffs, its customers, a duty of care not to misrepresent facts and characteristics of its products.

164.   TLC represented that the Raspberry Tea contained 0.0% THC and was THC-free. These representations were false.

165.   In making these false representations to Plaintiffs, TLC failed to exercise due care.

166.   TLC's misrepresentations were material, in that Plaintiffs would not have purchased the Raspberry Tea if they had known the product contained THC.

167.   Justifiably relying on TLC's misrepresentations, Plaintiffs purchased the Raspberry Tea, resulting in damages and causing them to ingest harmful illegal substances.

//

//

//

## EIGHTH CAUSE OF ACTION
### (Innocent Misrepresentation; Asserted by Plaintiffs Individually and on Behalf of the National Class)

168.   Plaintiffs incorporate by reference all of the above allegations as if fully set forth herein.

169.   TLC represented that the Raspberry Tea contained 0.0% THC and was THC-free. These representations were false when they were made, as the Raspberry Tea contained THC.

170.   The representations were material, in that Plaintiffs and all National Class Members would not have purchased the Raspberry Tea if they had known the product contained THC.

171.   The representations were made in connection with making a contract between Plaintiffs and all National Class Members on the one hand and TLC on the other hand: namely, the sale of Raspberry Tea by TLC to Plaintiffs and all National Class Members.

172.   Plaintiffs and all National Class Members would not have purchased the Raspberry Tea if not for TLC's representations that it was THC-free.

173.   As a result of purchasing the Raspberry Tea, Plaintiffs and all National Class Members lost money equivalent to the purchase price of the Raspberry Tea.

174.   These losses benefitted TLC, as TLC profited off the sale of the

Raspberry Tea to Plaintiffs and all National Class Members.

## NINTH CAUSE OF ACTION
**(Intentional Misrepresentation; Asserted by Plaintiffs Individually)**

175. Plaintiffs incorporate by reference all of the above allegations as if fully set forth herein.

176. TLC represented that the Raspberry Tea contained 0.0% THC and was THC-free. These representations were false when they were made, as the Raspberry Tea contained THC.

177. TLC either knew these representations were false, or else made them recklessly:

a. TLC was aware that consumers reported the Raspberry Tea had caused them to fail drug tests;

b. At no point did TLC employ quality control measures or testing to ensure that the Raspberry Tea was THC-free. Had TLC tested its products, it would have known that the Raspberry Tea contained THC; and

c. Once TLC became aware that the Raspberry Tea contained THC, it de-published the fact sheet and stopped selling the product on its main website, but did not direct its Life Changers to stop making representations about THC content, stop selling the Raspberry Tea,

34

or stop advertising the Raspberry Tea as THC-free, and continued

to offer it for sale on Life Changer websites.

178.   TLC made these representations to Plaintiffs with the intent that they

rely on said representations to purchase the Raspberry Tea.

179.   As a result of their reliance, Plaintiffs purchased the Raspberry Tea, and

incurred damages, including medical bills, emotional distress, loss of wages, loss of

future earning capacity, reputational damage, and loss of goodwill.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and all Class Members pray that the Court:

A.     Certify this action as a class action;

B.     Award all actual, direct, incidental, statutory, consequential, punitive,

and exemplary damages to be determined at trial;

C.     Grant appropriate injunctive and/or declaratory relief, including

restitutionary relief;

D.     Award pre- and post-judgment interest;

E.     Award attorney's fees and costs of suit; and

F.     Award such other and further relief the Court deems appropriate.

//

//

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

**DATED:** February 1, 2021                       s/ Karl S. Kronenberger

**TRAVERSE LEGAL, PLC**
Enrico Schaefer (P43506)
Mark Clark (P41652)
[Mailing Address For All Mail During
COVID]
810 Cottageview Dr., G20
Traverse City, MI, 49684
Telephone: (231) 932-0411

[Detroit Office]
440 Burroughs St.
Detroit, MI 48202
Telephone: (866) 936-7447
enrico.schaefer@traverselegal.com
mark@traverselegal.com

**KRONENBERGER ROSENFELD, LLP**
Karl S. Kronenberger
Jeffrey M. Rosenfeld (*pro hac vice
forthcoming*)
Katherine E. Hollist (*pro hac vice
forthcoming*)
150 Post Street, Suite 520
San Francisco, CA  94108
Telephone: (415) 955-1155
karl@KRInternetLaw.com
jeff@KRInternetLaw.com
kate@KRInternetLaw.com

***Attorneys for Plaintiffs***

36